UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------
JEAN-GESPERE PIERRE,

                       Plaintiff,                    **MEMORANDUM & ORDER**
                                                                    15-CV-4627 (MKB)
                       v.

FJC SECURITY SERVICES, INC.,

                       Defendant.
----------------------------------------------------------------
MARGO K. BRODIE, United States District Judge:

       Plaintiff Jean-Gespere Pierre, proceeding *pro se*, commenced the above-captioned action on September 2, 2015, against Defendant FJC Security Services, Inc. ("FJC"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").[1] (Compl., Docket Entry No. 1.) Plaintiff alleges that FJC retaliated against him for reporting sex-based discrimination occurring at FJC and discriminated against him based on his sex. (*Id.* at 3–4.) FJC moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Def. Mot. for Summ. J ("Def. Mot."), Docket Entry No. 68; Def. Mem. of Law in Supp. of Def. Mot. ("Def. Mem."), Docket Entry No. 69.) For the reasons set forth below, the Court grants FJC's motion and dismisses the action.

   **I.   Background**

       FJC is a company that provides security services within the New York metropolitan area. (Decl. of Orville Morgan ("Morgan Decl.") ¶ 4, Docket Entry No. 68-1.) On November 12, 2012, Plaintiff began working for FJC as a security officer. (Pl. Dep. 31:23–25, 32:24–33:4,

---

[1] At a pre-motion conference on November 12, 2015, Plaintiff informed the Court that his claims were only pursuant to Title VII and that he was not pursuing any claims under state or city law. (Minute Entry dated Nov. 13, 2015.)

68:13, Docket Entry Nos. 68-6–68-9.) Plaintiff typically worked from 4:00 PM to 12:00 AM at the Bellevue Men's Shelter operated by the New York City Department of Homeless Services (the "Shelter"). (Pl. Dep. 36:12–14, 156:2–10; Orville Decl. ¶ 3.) Plaintiff alleges that FJC terminated his employment in retaliation for sex-based discrimination complaints he lodged against FJC employees and discriminated against him by terminating his employment because of his sex. (Compl. 3–4.)

### a. Alleged acts of discrimination and retaliation

#### i. May 29, 2014 incident

On May 29, 2014, Plaintiff arrived at the Shelter to start his shift and was assigned to monitor the seventh floor with Tiffany Murray, another FJC security officer. (Pl. Dep. 68:7–69:2.) Murray monitored the east side of the seventh floor and Plaintiff monitored the west side. (Pl. Dep. 76:17–23.) Pursuant to FJC's policy, security officers assigned to the same floor are supposed to inform their partners and their supervisor before taking a break and sign a logbook to indicate that they are on break. (Pl. Dep. 70:7–71:19.) When Plaintiff was ready to take his lunch break, he attempted to inform Murray but could not reach her. (Pl. Dep. 73:21–74:12.) Plaintiff went to Murray's post and saw that Supervisor Andre Dieudonne was covering Murray's post. (Pl. Dep. 87:12–88:10.) According to Plaintiff, Supervisor Derrick Daley was the seventh floor supervisor that should have been covering Murray's post, not Supervisor Dieudonne. (Pl. Dep. 89:16–90:25.) Plaintiff checked the logbook to see if Murray was on lunch break and saw that she had not signed out for lunch. (Pl. Dep. 80:11–13.) Plaintiff then called Murray on her cellular telephone but she did not answer. (Pl. Dep. 70:7–71:19.) Although lunch breaks were limited to thirty minutes, Murray had been gone for more than thirty minutes and Plaintiff could not take his break until she returned. (Pl. Dep. 94:14–19, 95:5–9.)

Murray subsequently returned, told Plaintiff that she was at lunch and "g[a]ve [Plaintiff] trouble" for attempting to contact her during her lunch break. (Pl. Dep. 74:9–12.) Plaintiff reported Murray's conduct to Supervisor Dianne Lloyd and Supervisor Daley, both of whom stated that they would address the issues with Murray. (Pl. Dep. 77:14–78:22, 81:11–20, 96:23–97:8.) Supervisor Lloyd and Supervisor Dennis Francis spoke to Murray but took no disciplinary action against Murray. (Pl. Dep. 84:2–86:2.) Plaintiff believes that none of the supervisors disciplined Murray because she was a woman and they were interested in dating her. (Pl. Dep. 80:23–81:3, 92:3–8, 193:12–20.)

Based on the foregoing, Plaintiff told Captain Natasha Drew, FJC's lead supervisor for the Shelter, that he no longer wanted to work with Murray. (Pl. Dep. 98:4–6.) Captain Drew told Plaintiff that he no longer had to work with Murray. (Pl. Dep. 106:11–14, 107:1–25.) To avoid any further interactions with Murray, Plaintiff would arrive for his shift a few minutes late. (Pl. Dep. 102:21–103:6.)

### ii. June of 2014 incident

In June of 2014, Supervisor Lloyd informed all FJC security officers that they were required to display their security officer identification and credentials while at work, and that they would be prohibited from working without their identification and credentials. (Pl. Dep. 154:17–23.) However, if an officer forgot to bring his or her credentials, the supervisors would allow the officer to display a photocopy if the officer was a friend of the supervisor. (Pl. Dep. 155:3–21, 158:12–21, 159:12–160:10.) On a day in June of 2014, Supervisor Daley asked Plaintiff to display his security officer identification and credentials while at work. (Pl. Dep. 153:16–20, 154:6–13.) Plaintiff believes that Supervisor Daley made the request in retaliation for Plaintiff reporting Murray's May 29, 2014 conduct. (Pl. Dep. 152:25–153:2, 171:5–7.)

3

### iii. July 31, 2014 incident

Plaintiff had no further interactions with Murray from May 29 through July 30, 2014. (Pl. Dep. 103:25–104:5, 111:22–25.) On July 31, 2014, Plaintiff, still seeking to avoid Murray, arrived for his 4:00 PM shift a few minutes late. (Pl. Dep. 102:21–103:6.) While Plaintiff was in the employee locker room putting on his uniform, Murray entered the locker room and instructed Plaintiff to "let her pass." (Pl. Dep. 103:8–13.) Plaintiff allowed her to pass. (Pl. Dep. 103:13.)

Plaintiff checked in to start his shift and Supervisor Francis informed him that he was partnered with Murray. (Pl. Dep. 119:20–23.) Plaintiff told Supervisor Francis that he and Murray could not be assigned to work together, but Supervisor Francis ignored Plaintiff and told him to "go work with her." (Pl. Dep. 119:24–120:8.) When lunch time arrived, Plaintiff called his supervisor to inform the supervisor that he was taking his lunch break. (Pl. Dep. 121:6–10.) The supervisor asked Plaintiff if Murray was at her post and Plaintiff responded that she was. (Pl. Dep. 121:7–9.) Plaintiff's supervisor gave him permission to take his lunch break. (Pl. Dep. 121:9–10.) However, when Plaintiff went to inform Murray that he was taking his lunch break, Murray was not at her post. (Pl. Dep. 121:11–14.) Plaintiff checked the logbook and saw that Murray was on her lunch break. (Pl. Dep. 120:22–121:2.) As a result, Plaintiff had to wait for Murray to return from lunch before he could take his lunch break. (Pl. 121:20–23.)

After Murray returned from her lunch break, Plaintiff attempted to sign out for lunch in the logbook but Murray "pulled [the] book" from Plaintiff's hands and, although the time for her lunch break had elapsed, she said that "[she] wasn't finished" and that "[her] lunch was not over yet." (Pl. Dep. 122:16–123:14.) Plaintiff did not respond to Murray's actions. (Pl. Dep. 123:7–9.) Instead, Plaintiff reported the incident to Supervisor Francis, who decided to assign Plaintiff to work in a different area of the Shelter where Murray was not assigned to work. (Pl. Dep.

4

123:21–124:5, 124:20–22.) There was no change in Plaintiff's shift or salary as a result of the reassignment. (Pl. Dep. 125:9–17.)

Plaintiff reported the logbook and locker room incidents with Murray to the New York City Police Department ("NYPD"), seeking an order of protection against Murray because she "assault[ed] and harass[ed]" him by pulling the book from his hands and he believed that she wanted to fight him. (Pl. Dep. 122:16–21, 127:4–11; Police Report, Docket Entry No. 68-17.) The police officers instructed Plaintiff to call the police if Murray "attack[ed] him again." (Pl. Dep. 129:14–18.)

### iv. August 15, 2014 incident

On August 15, 2014, Supervisor Lloyd approached Plaintiff at work and asked what type of report he had filed with the NYPD. (Pl. Dep. 132:16–20.) Plaintiff told Supervisor Lloyd that she should not be speaking to Plaintiff because he had filed police reports against her and other FJC employees. (Pl. Dep. 133:21–134:5.) Supervisor Lloyd then attempted to shake Plaintiff's hand, and in response Plaintiff became "upset," replied that Supervisor Lloyd should "not shake [his] hand," asked Supervisor Lloyd why she "continued to [try to shake his hand] everyday," and yelled at Supervisor Lloyd for following him and attempting to talk to him. (Pl. Dep. 133:25–134:6, 137:3–22.) Because of Plaintiff's conduct toward Supervisor Lloyd, Plaintiff received a disciplinary notice. (Employee Violation Notices at 9, Docket Entry No. 68-10.)[2] Plaintiff also believes that Supervisor Lloyd and Captain Drew subsequently assigned him to a post near the supervisors' office in retaliation for him filing a police report. (Pl. Dep. 143:2–25, 147:3–10.) According to Plaintiff, he also reported Supervisor Lloyd's conduct to Orville Morgan, FJC's Senior Director of Operations who oversaw FJC's operations at the Shelter. (Pl.

---

[2] Because the Employee Violation Notices are not consecutively paginated, the Court refers to the electronic document filing system ("ECF") pagination.

5

Dep. 170:9–13.) Plaintiff asserts that Director Morgan informed him that Supervisor Lloyd no longer worked for FJC. (Pl. Dep. 170:9–13.) Director Morgan denies that he told Plaintiff that Supervisor Lloyd stopped working for FJC. (Morgan Decl. ¶ 13.)

### v. November 8, 2014 incident

Between August and early November of 2014, Plaintiff had no problems at work. (Pl. Dep. 171:18–172:4.) On November 8, 2014, Plaintiff arrived at the Shelter to start his shift and observed that Supervisor Lloyd was there in uniform. (Pl. Dep. 172:4–19, 179:18–22.) Toward the end of Plaintiff's shift, Supervisor Lloyd informed several security officers, including Plaintiff, over FJC's handheld employee radios that they must work past the end of their shifts because their replacements were running late. (Pl. 177:18–19, 179:23–25.)

According to Plaintiff, he radioed in reply that he no longer "recongnize[d] [Supervisor Lloyd] as [his] supervisor" because she was fired and questioned why Supervisor Lloyd was giving him orders. (Pl. Dep. 176:4–14, 177:19–24, 179:25–180:6.) Plaintiff then proceeded from his post to the supervisors' office, where Supervisor Lloyd, Captain Drew and a few other FJC employees were located, and "curs[ing]" as well as "speaking very loud[ly]," told Supervisor Lloyd that he had filed "confidential reports" against her. (Pl. Dep. 180:10–22, 183:3–5, 185:5–9, 199:3–7.) When Plaintiff was near Supervisor Lloyd's location, the supervisors and employees around Supervisor Lloyd shielded her because they believed Plaintiff intended to fight her. (Pl. Dep. 183:3–13.) Plaintiff denies that he intended to fight Supervisor Lloyd. (Pl. Dep. 181:7–10.) Because of Plaintiff's conduct toward Supervisor Lloyd, the Shelter's police escorted Plaintiff out of the Shelter. (Pl. Dep. 189:2–24.) Plaintiff believes that Captain Drew allowed Supervisor Lloyd to return to work in retaliation for Plaintiff allegedly causing Supervisor Lloyd's termination. (Pl. Dep. 174:4–11.)

Supervisor Lloyd completed an incident report the day of the November 8, 2014 incident. (Incident Reports 95–97, Docket Entry No. 68-11.) According to Supervisor Lloyd, she informed several security officers, including Plaintiff, that they had to stay past the end of their shifts to cover for the replacement security officers who were running late. (*Id.* at 95.) Supervisor Lloyd instructed the officers that if they had issues staying late, they should discuss the issues with her in the office and not over the radio. (*Id.*) Plaintiff disregarded Supervisor Lloyd's instruction and began yelling over the radio that he "d[id]n't work for [Supervisor Lloyd]," that Supervisor Lloyd should not "call [Plaintiff's] [expletive] name," that Supervisor Lloyd was a "sex offender" and a "criminal" and "put false reports in [Plaintiff's] name." (*Id.*) Supervisor Lloyd notified Captain Drew of the situation as it was ongoing. (*Id.*)

Supervisor Lloyd subsequently observed Plaintiff "coming down the hall toward the [] office." (*Id.* at 96.) After Plaintiff entered the office, he approached Supervisor Lloyd at her desk, "pointed his fingers in [her] face" and again yelled that he "d[id]n't work for [Supervisor Lloyd]," that Supervisor Lloyd should not "call [Plaintiff's] [expletive] name," and that Supervisor Lloyd was a "sex offender" and a "criminal." (*Id.*) Supervisors Charlene Dunlop, Andrea Brito, Dieudonne and several security officers restrained Plaintiff and forced him out of the office. (*Id.*) Captain Drew requested the assistance of the Shelter's police. (*Id.* at 97.) Plaintiff forced his way back into the office and proceeded toward Supervisor Lloyd in "a very threatening manner," but before he reached Supervisor Lloyd, Supervisors Dunlop and Dieudonne corralled Plaintiff and removed him from the office. (*Id.*) Shortly thereafter, the Shelter's police officers arrived, escorted Plaintiff to the locker room to retrieve his belongings and then escorted him out of the Shelter. (*Id.*) Captain Drew, Supervisors Dunlop, Dieudonne, and Brito, as well as two security officers who were present in the office, also completed incident reports the day of the November 8, 2014 incident. (Incident Reports 89–94, 98–109.) Their

7

reports were consistent with Supervisor Lloyd's incident report. (*Compare* Incident Reports 95–97 *with* Incident Reports 89–94, 98–109.)

      vi.    **Plaintiff's termination**

On November 12, 2014, one of the managers of the Shelter emailed Director Morgan and informed him that Plaintiff was banned from working at the Shelter in the future due to his conduct on November 8, 2014. (Email dated Nov. 12, 2014, Docket Entry No. 68-12.) Based on the Shelter's ban and the fact that Plaintiff's conduct on November 8, 2014, violated several FJC policies, FJC terminated Plaintiff's employment. (Morgan Decl. ¶¶ 7–9, 20; FJC Employee Code of Conduct, Docket Entry No. 68-4.) Jennifer Stone, FJC's Director of Human Resources, made the decision to terminate Plaintiff's employment. (Morgan Decl. ¶ 20.)

After learning of his termination, Plaintiff wrote a letter to FJC in which he stated that he was terminated because Supervisor Lloyd, Captain Drew and Murray plotted against him because they were all intimate or wanted to be intimate with each other. (Pl. Letter dated Dec. 16, 2014, Docket Entry No. 68-18.) Plaintiff stated in the letter that:

> [Captain] Drew helped [Supervisor] Lloyd to come back in secret, but on November 8, 2014, [Supervisor] Lloyd wanted to show her power [and] told me, I was [required to work] late. I replied by radio, "You cannot call my name for holding, because [for] [three] months nobody [has] recognized you as [a] [s]upervisor [], don't call my name, [] you are a criminal who used my name falsely in a false statement to make a sexual [proposal] [to] Tiffany Murray."

(*Id.*) Plaintiff also stated that FJC terminated him "without notice" and that he went to Director Stone's office and requested a statement of reasons regarding his termination, but Director Stone refused his request. (*Id.*)

    **b.**    **Plaintiff's complaints to the New State Division of Human of Rights**

During the course of Plaintiff's employment with FJC, Plaintiff filed two complaints with the New York State Division of Human Rights ("Human Rights Division"). On June 18, 2014,

8

Plaintiff filed a complaint, alleging that FJC discriminated against him based on his sex because on May 29, 2014, FJC "[r]efused to accept [his] report" about a "fire in the building." (Pl. June 18, 2014 Human Rights Division Compl. 1–6, Docket Entry No. 68-13.) Plaintiff further alleged that Supervisors Daley and Dieudonne discriminated against him based on his sex because when he "was assigned [to work] [o]n the [seventh] floor, [his] partner was female . . . [and] she never obey[ed] the policy of FJC [], [which stated that] no guard or officer [should] leave their post without notify[ing] base, writing in [the] logbook and tell[ing] his/her partner." (*Id.* at 8.) Plaintiff also alleged that "Supervisor [] Dieudonne cover[ed] [his partner's] absence when she left" and when he "explained what happened" to "Supervisor [] Daley," he was ignored and his partner was never instructed to follow policy or disciplined for failing to do so.[3] (*Id.*)

Plaintiff filed his second Human Rights Division complaint on August 5, 2014, alleging that on July 31, 2014, Supervisors Lloyd and Francis sexually harassed him. (Pl. Aug. 5, 2014 Human Rights Division Compl. 1–5, Docket Entry No. 68-15.) Plaintiff alleged that "Supervisor [] Lloyd . . . offered [his] co-worker help secretly" and the co-worker subsequently "came [to] [his] locker [] to trouble [him]." (*Id.* at 8.) Plaintiff identified the co-worker as "Tiffany Murray." (*Id.*) On February 3, 2015, the Human Rights Division found that there was "no probable cause to believe that [FJC] engaged in or is engaging in the unlawful discriminatory practice complained of." (Human Rights Division Decision, annexed to Pl. Mem. in Opp'n to Def. Mot. ("Pl. Mem.") at 158–61, Docket Entry No. 67.)[4]

---

[3] The record does not contain any information regarding the outcome of Plaintiff's June 18, 2014 complaint to the Human Rights Division.

[4] Because Plaintiff's Memorandum and attachments are not consecutively paginated, the Court refers to the ECF pagination.

## II. Discussion

### a. Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Davis v. Shah*, 821 F.3d 231, 243 (2d Cir. 2016); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id*. The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Title VII claims

FJC argues that the Court should dismiss Plaintiff's claims because Plaintiff fails to show that FJC either retaliated or discriminated against him based on his sex. (Def. Mem. 9–22.) Plaintiff argues that the FJC supervisors retaliated against him for reporting the sex-based discriminatory conduct of Murray and Supervisors Lloyd, Daley, Dieudonne and Francis to FJC,

the NYPD and the Human Rights Division.[5] (Pl. Mem. 14–15, 17, 20, 22, 28–29, 32–33; Pl. Sur-reply Mem. of Law in Opp'n to Def. Mot. ("Pl. Sur-reply") 3–5, Docket Entry No. 71.) Plaintiff also argues that he was discriminated against based on his sex because, unlike Murray, he was not a woman for whom the supervisors held a romantic interest.[6] (Pl. Mem. 14–15, 17, 20, 22, 28–29, 32–33; Pl. Sur-reply 3–5.) The Court separately addresses Plaintiff's retaliation and discrimination claims below.

---

[5] Because Plaintiff is proceeding *pro se*, the Court must construe Plaintiff's papers "to make the strongest arguments they suggest." *See Wiley v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015). A Title VII retaliation claim requires showing that an employer retaliated against an employee for engaging in a protected activity. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) (discussing the elements of Title VII retaliation claims, which include "participation in a protected activity"). Although Plaintiff argues that he was retaliated against for lodging complaints about his arguments with Murray, any of Plaintiff's complaints based on his arguments with Murray are not activities that are entitled to protection from retaliation under Title VII. *See Lizardo v. Denny's Inc.*, 270 F.3d 94, 106 (2d Cir. 2001) (holding that the plaintiffs did not engage in "a protected activity because they were complaining about the conduct of security officers during [a] fight," not "about discrimination") Therefore, the Court construes Plaintiff's retaliation claim as an allegation that FJC retaliated against him for lodging complaints against Murray and the supervisors regarding their alleged sex-based discrimination, because if Plaintiff establishes that he complained that FJC strictly enforced its policies against Plaintiff, and not against Murray, only because Plaintiff is a man and Murray is a woman, the complaints qualify as protected activity. *See Singer v. Tuffey*, 66 F. App'x 232, 235 (2d Cir. 2003) ("[The] plaintiff's complaints to [the defendants] each alleged that she was being discriminated against on the basis of her sex, and as such constitute Title VII protected activities." (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000))).

[6] Construing Plaintiff's papers to make the strongest arguments they suggest, the Court considers Plaintiff's termination as the adverse action taken by FJC against Plaintiff for both the retaliation and discrimination claims. However, the alleged acts of assigning Plaintiff to a different section of the Shelter, placing Plaintiff on a post near the supervisors' office, partnering Plaintiff with Murray, and requesting Plaintiff's security officer identification and credentials do not qualify as adverse actions since those acts did not result in any material changes to Plaintiff's employment. *See Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) ("To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." (citations and internal quotation marks omitted)).

### i. Plaintiff's retaliation claim

FJC argues that Plaintiff's retaliation claims fail because Plaintiff never engaged in protected activity by opposing an unlawful employment practice. (Def. Mem. 17–18.) Plaintiff argues that reporting the sex-based discriminatory conduct of Murray and Supervisors Lloyd, Daley, Dieudonne and Francis is a protected activity. (Pl. Mem. 14–15, 17, 20, 22, 28–29, 32–33; Pl. Sur-reply 3–5.)

Title VII prohibits retaliation against an employee who "has opposed any practice [that is] made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-(3)(a). Retaliation claims are analyzed under the three-stage, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)) (discussing burden-shifting); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (citing *Tex. Dep't of Cty. Affairs v. Burdine*, 450 U.S. 248, 253–55 (1981)). Under that framework, a plaintiff must first establish a prima facie case of retaliation. *St. Mary's Honor Ctr.*, 509 U.S. at 506; *Campbell v. N.Y.C. Transit Auth.*, 662 F. App'x 57, 59 (2d Cir. 2016); *Kirkland v. Cablevision Sys.*, 760 F. 3d 223, 225 (2d Cir. 2014). A plaintiff's burden at this stage is "minimal." *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 506). If a plaintiff meets her burden at this stage, a "temporary presumption" of retaliation arises, and the burden shifts to the defendant employer to articulate a legitimate, non-retaliatory reason for the challenged conduct. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) (quoting *Littlejohn*, 795 F.3d at 307, 311). If the defendant-employer articulates such a reason, the burden shifts back to the plaintiff-employee to show that the defendant-employer's reason was pretext. *Id.* at 83.

To establish a prima facie case of discriminatory retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id*. at 316 (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).

"An employee's complaint may qualify as protected activity, satisfying the first element" of a prima facie case of retaliation "so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (citation omitted). In a Title VII retaliation case, "the plaintiff is required to have a good faith reasonable belief that []he was opposing an employment practice made unlawful by Title VII." *Id.* (citation and internal quotation marks omitted). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." *Id.* (citation omitted). "Mere subjective good faith belief is insufficient; the belief must be reasonable and characterized by objective good faith." *Id.* at 16 (alteration and citation omitted). Therefore, an employee lacks a reasonable belief that he is opposing an unlawful employment practice if the opposition is "directed at something . . . that is not properly within the definition of an unlawful employment practice." *Id.* at 15 (citation omitted).

The Second Circuit "has long [] rejected 'paramour preference' claims, which depend on the proposition that the phrase 'discrimination on the basis of sex' encompasses disparate treatment premised not on one's gender, but rather on a romantic relationship between an employer and a person preferentially treated." *Id.* at 14 (quoting *DeCintio v. Westchester Cty. Med. Ctr.*, 807 F.2d 304, 306 (2d Cir. 1986)); *see also Fattoruso v. Hilton Grand Vacations Co., LLC*, 525 F. App'x 26, 28 (2d Cir. 2013) ("We have squarely held that a 'paramour preference'

does not constitute unlawful discrimination based on gender." (citing *Kelly*, 716 F.3d at 14)); *Marcus v. Leviton Mfg. Co., Inc.*, No. 15-CV-656, 2016 WL 74415, at *5 (E.D.N.Y. Jan. 6, 2016) ("It is well settled that favoritism of an employee based upon a consensual romantic relationship, frequently referred to as 'the paramour preference', is not actionable under Title VII . . . as a form of gender discrimination." (citing *Kelly*, 716 F.3d at 14)); *Grant v. United Cerebral Palsy of N.Y.C., Inc.*, No. 11-CV-18, 2014 WL 902638, at *6 (S.D.N.Y. Mar. 7, 2014) ("This claim fails because it is not actionable under Title VII. The Second Circuit has long since rejected paramour preference claims, which depend on the proposition that . . . discrimination on the basis of sex encompasses disparate treatment premised not on one's gender, but rather on a romantic relationship between an employer and a person preferentially treated." (alteration and internal quotation marks omitted) (citing *Kelly*, 716 F.3d at 14)); *Kranser v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 520 (S.D.N.Y. 2010) ("[T]he law is clear that preferential treatment of a paramour is not unlawful because it does not discriminate against anyone on account of his or her gender." (citing *DeCintio*, 807 F.3d at 308)). Thus, a plaintiff's Title VII retaliation claims are not actionable where the alleged protected activity are complaints about the plaintiff's alleged mistreatment and a co-worker's preferential treatment due to another employee's romantic interest in the co-worker, as such complaints are not opposing the unlawful employment practice of sex-based discrimination. *See Kelly*, 716 F.3d at 14 (Title VII retaliation claims fail where they are based on a "paramour preference," because such discrimination is not "'discrimination on the basis of sex,' but rather on a romantic relationship between an employer and a person preferentially treated. It is axiomatic that in order to establish a sex-based [claim] under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." (alteration and citation omitted)); *see also Fattoruso*, 525 F. App'x at 28.

Based on Plaintiff's complaint, Plaintiff's motion papers and the record before the Court, Plaintiff is arguing that he was subjected to retaliatory action for reporting Murray's conduct and the supervisors' alleged preferential treatment toward Murray because they were romantically interested in Murray. (*See, e.g.*, Compl. 4 ("The cause of my summons was [Supervisor] Lloyd's . . . proposed sexual [relationship] with [a] female security guard named Tiffany Murray, [who] assaulted me [and] th[at] [Supervisor] Lloyd [] transferred [and] fired me."); Pl. Mem. 14 ("[T]he nature of the allegation [is] sex discrimination retaliation by [S]upervisor [] Daley," who wanted a romantic relationship "with guard Tiffany Murray for sex [] to get [] [P]laintiff out of his job. . . . Tiffany Murray made another sex-proposal with [S]upervisor [] Lloyd."); Pl. Dep. 109:23–110:2 ("The big thing happen[ed] [because] [Supervisor] Lloyd . . . wanted the lady to become her girlfriend.").) Because Plaintiff alleges that he was discriminated against based on the supervisors' romantic interest in Murray, Plaintiff's retaliation claim fails to establish that he opposed "an employment practice made unlawful by Title VII." *Kelly*, 716 F.3d at 14; *see also Fattoruso*, 525 F. App'x at 28; *Marcus*, 2016 WL 74415, at *5; *Grant*, 2014 WL 902638, at *6; *Kranser*, 680 F. Supp. 2d at 520; *cf. Day v. City of New York*, No. 15-CV-4399, 2015 WL 10530081, at *11–12 (S.D.N.Y. Nov. 30, 2015) ("*Kelly* . . . dealt with a complaint of 'paramour preference,' not a complaint of differential treatment of male versus female employees."), *report and recommendation adopted*, 2016 WL 1171584, (S.D.N.Y. Mar. 22, 2016).

Accordingly, the Court grants FJC's motion as to Plaintiff's retaliation claims.[7]

---

[7] Even assuming Plaintiff had established a prima facie case of Title VII retaliation, Plaintiff's claims nevertheless fail because FJC has presented a legitimate, non-retaliatory reason for terminating Plaintiff's employment — Plaintiff's conduct toward Supervisor Lloyd on November 8, 2014, which violated FJC's policies — and Plaintiff fails to show that FJC's proffered reason was pretext. (Morgan Decl. ¶¶ 7–9, 20; FJC Employee Code of Conduct.) The

### ii. Plaintiff's discrimination claim

FJC argues that Plaintiff fails to establish a Title VII discrimination claim because his claim is based on his disagreements with Murray and the supervisors' alleged preferential treatment toward Murray. (Def. Mem. 12–14.) Plaintiff argues that FJC discriminated against him because he was not a woman with whom the supervisors' were romantically interested. (Pl. Mem. 14–15, 17, 20, 22, 28–29, 32–33; Pl. Sur-reply 3–5.)

Title VII discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework outlined above. *See Littlejohn*, 795 F.3d at 307–08. To establish an employment discrimination claim, Title VII requires that "a plaintiff must first establish a *prima facie* case of discrimination by showing that: '(1) []he is a member of a protected class; (2) []he is qualified for h[is] position; (3) []he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Vega*, 801 F.3d at 83 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)).

As discussed above, the alleged discrimination Plaintiff suffered was not based on his sex, but instead was based on the supervisors' alleged preferential treatment of Murray because of their romantic interest in her. For the same reasons, Plaintiff fails to establish a prima facie

---

Incident Reports and Plaintiff's own admissions establish that Plaintiff yelled and cursed at Supervisor Lloyd and then went to the supervisors' office and yelled at, cursed at, and approached Supervisor Lloyd as if he was going to fight her. (Incident Reports 89–109; Pl. Dep. 176:4–14, 177:19–24, 179:25–180:22, 183:3–13, 185:5–9, 199:3–7; Pl. Letter dated Dec. 16, 2014.) Plaintiff therefore fails to show that the proffered reason for his termination was pretext. *See Caruso v. Bon Secours Charity Health Sys. Inc.*, --- F. App'x ---, ---, 2017 WL 3638203, at *2 (2d Cir. Aug. 24, 2017) (holding that the plaintiff "failed to offer sufficient evidence of pretext" because the plaintiff "offered no evidence that her termination was caused by her months-old complaint, rather than by the physical altercation that violated [the defendant's] standards of conduct and immediately preceded her termination"); *Sanchez v. Conn. Nat. Gas Co.*, 421 F. App'x 33, 35 (2d Cir. 2011) (holding that a plaintiff failed to show pretext where his termination was based on his "violat[ions] of multiple company policies").

case of discrimination as Plaintiff cannot establish that he was discriminated against based on his sex. *See Kelly*, 716 F.3d at 14 (Title VII discrimination and retaliation claims fail where they are based on a "paramour preference," because such discrimination is not "'discrimination on the basis of sex,' but rather on a romantic relationship between an employer and a person preferentially treated. It is axiomatic that in order to establish a sex-based [claim] under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." (alteration and citations omitted).

Accordingly, the Court grants FJC's motion as to Plaintiff's discrimination claims.[8]

### c. Leave to amend

"Although district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings, leave to amend need not be granted when amendment would be futile." *Terry v. Incorporated Village of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)). Granting leave to amend is futile where "[t]he deficiency in [the] complaint" is not due to "a lack of adequate factual allegations but rather a lack of entitlement to the relief sought." *Wright v. Semple*, --- F. App'x ---, ---, 2017 WL 3722711, at *2 (2d Cir. Aug. 29, 2017); *see also Chen v. City of New York*, 622 F. App'x 66, 68 (2d Cir. 2015) (holding that denying leave to amend is proper where "the complaint did not 'suggest that the plaintiff has a claim that he has inadequately or inartfully pleaded'" (alterations omitted) (quoting *Cuoco*, 222 F.3d at 112)). As discussed above, Plaintiff's claims fail because paramour preference claims are not actionable under Title VII and, alternatively, Plaintiff cannot

---

[8] In addition, as with the retaliation claims, even assuming Plaintiff established a prima facie case of discrimination, Plaintiff cannot establish that FJC's proffered reason for terminating him was pretext. *See* note 9, *supra*; *see also Caruso*, --- F. App'x at ---, 2017 WL 3638203, at *2 (holding that the plaintiff's discrimination claim failed for the same reason as plaintiff's retaliation claim — plaintiff's failure to establish that the defendant's proffered reason for plaintiff's termination was pretext).

establish that FJC's proffered reason for terminating him was pretext. Therefore, granting Plaintiff leave to amend would be futile as the defect with his claims is not "a lack of adequate factual allegations," *see Wright*, --- F. App'x ---, 2017 WL 3722711, at *2, but that "the [C]omplaint d[oes] not 'suggest that the plaintiff has a claim that he has inadequately or inartfully pleaded,'" *see Chen*, 622 F. App'x at 68 (quoting *Cuoco*, 222 F.3d at 112)).

### III. Conclusion

For the foregoing reasons, the Court grants FJC's motion and dismisses the Complaint in its entirety. The Clerk of Court is directed to close this case.

SO ORDERED:

\_\_\_\_\_s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 19, 2017
       Brooklyn, New York

18